FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 27 2010 ★
BROOKLYN OFFICE

ORIGINAL
O&F
c/m

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MICHAEL GRYNBERG,

                Plaintiff,

-against-

THE CITY OF NEW YORK,

                Defendant.
----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 08-CV-2895 (FB) (VVP)

*Appearances:*
*For the Plaintiff:*
CHRISTOPHER L. STANLEY, ESQ.
Kuharski, Levitz & Giovinazzo
176 Hart Boulevard
Staten Island, New York 10301

*For the Defendant:*
MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the
City of New York
By:   KENNETH S. SASMOR, ESQ.
        MARIE A. BONITATIBUS, ESQ.
New York City Law Department
100 Church Street
New York, New York 10007

**BLOCK, Senior District Judge:**

On October 15, 2003, plaintiff Michael Grynberg ("Grynberg") was a passenger aboard the Staten Island Ferry vessel *Andrew J. Barberi* ("the *Barbieri*") when it crashed full-speed into a concrete pier at the St. George ferry terminal ("the accident"). The liability of the defendant, the City of New York ("the City"), has already been determined. *In re City of New York*, 475 F. Supp. 2d 235 (E.D.N.Y. 2007), *aff'd*, 522 F.3d 279 (2d Cir. 2008).

Grynberg claims to have suffered a serious brain injury, psychological trauma, and physical injuries to his jaw and nose. The City concedes that Grynberg suffered some injuries in the accident, but contests principally the severity of those

injuries.

A bench trial as to causation and damages was held on April 21-22 and 26, 2010. Grynberg's witnesses were himself; Lawrence Grynberg, his brother; Vilor Shpitalnik ("Shpitalnik"), his psychiatrist; Ira Klemons ("Klemons"), his dentist; and Ranga Krishna ("Krishna"), his neurologist. The City's witnesses were all retained experts: dentist Arthur Elias ("Elias"); psychiatrist Steven Fayer ("Fayer"); otolaryngologist or "ENT" David Slavit ("Slavit"); and neurologist Mitchell Raps ("Raps").

The following are the Court's combined findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

1. Grynberg, born on September 26, 1969, is 40 years of age; he was 34 at the time of the accident. He was sitting in a seat on the second level of the *Barbieri* when he heard other passengers screaming. He stood up, at which point the *Barbieri* struck the Staten Island pier. Grynberg was thrown into the seats in front of him, striking his head, jaw, and face. He then fell to the floor, striking his face and torso. Tr. at 7-8.

2. In March 2009 — nearly six years after the accident — an MRI revealed that Grynberg had lacunar infarcts. Infarcts can be explained simply as damage to small areas of brain tissue.

3. Grynberg's infarcts were not causally related to the accident. This conclusion is based upon the following:

    a. Both Krishna and Raps were highly credentialed and credible; however, the Court found Raps's explanation of Grynberg's infarcts more plausible and more consistent with the evidence.

    b. Raps evaluated Grynberg in 2007, finding "very little in the way of abnormalities[.]" Tr. at 446:02-03. Grynberg performed "perfectly fine" on a mental status examination. Tr. at 440:03-05.

    c. Krishna examined Grynberg on March 17, 2009; he observed "slight

slowness of mental function, some difficulty with weakness of various muscle groups" and "abnormal sensory and reflex findings[.]" Tr. 366:23-367:1. Krishna ordered the MRI which revealed Grynberg's infarcts.

d. Raps re-evaluated Grynberg in late 2009, finding that Grynberg's "cognitive function had changed, his affect has changed, his degree of arousal has changed[,]" concluding: "Clearly, something happened between 2007 and 2009[.]" Tr. at 446:04-08.

e. Krishna and Raps agreed that Grynberg's infarcts could have produced his cognitive and emotive changes. They disagreed on the cause of these injuries: Krishna opined that the accident was the cause. Raps opined that Krishna's explanation was not possible, and that Grynberg's brain injuries were more likely caused by minor strokes, Grynberg's medication, both, or some unascertainable cause (referred to in medicine as an "idiopathic" cause).

f. Grynberg's burden of proof does not require that he rule out all other possible causes of his brain injury, but it does require him to demonstrate that it is more likely than not that the brain injury was caused by the accident. Grynberg failed to meet this burden with respect to his brain injury:

   i. Raps's before-and-after assessment was corroborated by Fayer's, insofar as both doctors observed Grynberg, several years after the accident, without symptoms of the brain tissue conditions he now claims were caused by the accident. *See* ¶ 5, *infra*.

   ii. More than five years passed between the accident and the MRI that revealed Grynberg's infarcts. Krishna opined that infarcts "can take at least three years to occur." Tr. at 380. Raps first evaluated Grynberg in 2007, more than three years after the accident, and did not observe the cognitive and emotive deficits observed in 2009. Thus, Grynberg's infarcts did not develop within the period during which Krishna opined they would be expected to develop.

   iii. Raps testified that "blows to the cranium[,]" like that suffered by Grynberg aboard the *Barbieri*, "do not cause infarcts[;] they cause hemorrhages, if anything." Tr. at 453:16-17. Hemorrhages, in turn, do not cause infarcts. Tr. at 454. Moreover, "when you have head trauma, you're as bad as you're going to be at the moment you have the head trauma." Tr. at 456.

3

iv. Raps testified that Grynberg's infarcts were more likely caused by minor strokes, and that Grynberg's very elevated cholesterol level poses a significant risk factor for strokes. Krishna testified that he had ruled out cholesterol as a cause with a brain ultrasound revealing an absence of plaque buildup, Tr. at 419-20, but Raps testified that the size of Grynberg's infarcts were more indicative of blockages in smaller blood vessels that could not be mapped by an ultrasound. Tr. at 459-60.

4. Grynberg claims to have suffered psychological trauma as a result of the accident, specifically post-traumatic stress disorder ("PTSD") and depression. The City concedes that Grynberg had an adjustment reaction to the accident, but denies that his other psychological maladies resulted from the accident. The Court finds in favor of the City, for the following reasons:

   a. In general, the Court found Fayer, the City's expert psychiatric witness, to be more credible and more persuasive than Shpitalnik, Grynberg's treating psychiatrist.

   b. With respect to depression: The parties agree that Grynberg is clinically depressed at present, but differ as to whether his depression was caused by the accident. The Court finds that Grynberg failed to prove causation.

      i. Grynberg did not seek treatment for depression with a psychiatrist or psychologist until 2009, several years after the accident. Tr. at 103:17-19.

      ii. Fayer evaluated Grynberg in January 2008 and February 2010. Tr. at 277. He observed a marked difference between the first and second examinations: "[Grynberg] wasn't depressed when I first saw him . . . . [W]hen I saw him the second time, clinical depression had ensued." Tr. at 278-79.

      iii. Fayer opined that Grynberg's development of infarcts was one of several possible causes of his clinical depression that were more likely than the accident. Tr. at 282.

      iv. Fayer concluded: "[T]he kind of depression that he has, that is caused by an event and if it was caused by that event, you would have expected it to surface way before." Tr. at 283.

   c. With respect to PTSD:

4

i. Grynberg does not have PTSD. He has continued to ride the Staten Island Ferry frequently since the accident. Tr. at 108-09. Grynberg did not testify to any flashbacks, nightmares, or hallucinations related to the accident.

ii. Shpitalnik diagnosed Grynberg with PTSD, but could not support this diagnosis. Shpitalnik agreed that there were three basic symptoms of PTSD: flashbacks (reexperiencing traumatic events); arousal (fear, anxiety); and avoidance. Shpitalnik conceded that Grynberg had not exhibited two of the three symptoms (avoidance and arousal). Tr. at 143-46.

iii. In contrast to Shpitalnik, Fayer conducted a baseline evaluation years after the accident that showed no evidence of clinical depression or PTSD.

iv. Fayer rejected Shpitalnik's PTSD diagnosis: "[Grynberg] wasn't really anxious. He didn't exhibit any increased startle reaction"; "he did not witness ... anything horrific"; "he wasn't having flashbacks [or] intrusive thoughts"; and "there was [sic] no significant changes in what he was doing." Tr. at 280-81. Significantly, Grynberg was continuing to commute via the Staten Island Ferry: "Usually with PTSD you are going to see somebody who is avoid[ing] a certain thing[.]" Id.

d. With respect to the adjustment reaction:

i. Fayer diagnosed an "adjustment reaction" to the accident. Tr. at 288.

ii. The essential feature of an adjustment reaction or adjustment disorder is "the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors," typically developing within 3 months after the "stressor" and resolving within 6 months. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 623 (4th Ed. 1994) (commonly referred to as "DSM-IV").

iii. Fayer concluded that Grynberg's adjustment reaction had resolved by the time he evaluated him in 2008. Tr. at 288.

iv. Fayer conceded that the accident was a traumatic event, "no fun and games[.]" Tr. at 280. "[Grynberg] had thoughts, he had feelings, as anybody would have thoughts and feelings about any kind of

    traumatic incident that evolves in their lives[.]" Tr. at 288.

  v. Grynberg is entitled to damages for his adjustment reaction.

5. Grynberg suffered permanent damage to his jaw as a result of the accident.

  a. On October 17, two days after the accident, Grynberg went to the emergency room at Staten Island University Hospital.

    i. Grynberg's jaw had been painful since the accident, and the pain was increasing. He reported jaw swelling. Plaintiff's Ex. 3.

    ii. He was prescribed over-the-counter pain medication and discharged.

  b. Grynberg saw Klemons beginning in November 2003. Tr. at 176. Klemons diagnosed temporomandibular joint dysfunction ("TMJ"), which can be described as damage to the muscles, tendons, ligaments, and bone structures of the jaw. Tr. at 177-79.

  c. These injuries were a result of the impact Grynberg suffered in the accident.

  d. Klemons fashioned an orthopedic device for Grynberg in an effort to return his jaw to normal. Tr. at 180. Since either late 2003 or early 2004, Grynberg has worn this device for some portion of each day. Tr. at 95-97. While it has produced some improvement, the device has not returned Grynberg's jaw to its normal state.

  e. Klemons also administered injections into the jaw to reduce Grynberg's pain. The injections produced some diminution in pain but have not eliminated his jaw pain.

  f. Grynberg's jaw pain is permanent, and significant. It has caused him to significantly change his eating habits; he often foregoes breakfast and lunch to prevent jaw discomfort, and he eats pureed or liquified food more often than before. Tr. at 62-63. Foods that prove difficult to chew sometimes get stuck in his throat, causing nausea and/or vomiting. Tr. at 113.

  g. These changes in eating habits have produced other significant changes. Grynberg avoids social activities like dating at least in part because they involve eating; he "would actually order like liquid stuff, like soup," to avoid jaw discomfort, "and it looked very strange." Tr. at 63.

  h. Grynberg is entitled to damages for the injuries to his jaw.

6. Grynberg suffered a broken nose as a result of the accident.

   a. Soon after the accident, Grynberg saw his chiropractor, Dr. Kaufman; Dr. Kaufman observed that Grynberg might have a broken nose. Tr. at 89-90.

   b. Dr. John Turk, ENT, ("Turk") performed a reconstructive surgery in March 2005. *See generally* Plaintiff's Ex. 4 (records of Long Island Hospital pertaining to operation).

   c. The City's ENT, Dr. Slavit, opined that Grynberg's surgery was a cosmetic procedure to correct a deviated septum, not a repair of a fracture. Slavit presented as an advocate for the City, and the Court found his testimony not credible.

      i. Slavit had no baseline evaluation that permitted him to conclude to a reasonable degree of medical certainty that the injuries to Grynberg's nose were not causally related to the accident. He relied entirely upon the Staten Island University Hospital records of October 2003 for his conclusion, ignoring Grynberg's testimony and Turk's records that the trauma to the nose was caused by the accident.

      ii. Slavit also placed heavy emphasis on whether the damage to Grynberg's nose was properly categorized as: a nasal dorsal deformity; a deviated septum; a nasal septal fracture; a bony dorsal fracture; or something else. *See* Tr. at 345-47.

      iii. The disputed issue was whether Grynberg's nose was damaged as a result of the accident, and whether that damage required surgical correction. Slavit conceded that—at a minimum—Grynberg had a deviated septum as early as November 2003, one month after the accident. *See* Tr. at 326-31. Slavit also conceded that—after the surgery was performed—Grynberg's septum was "nice and straight." Tr. at 328.

      iv. Slavit offered no alternative theory of causation beyond mere speculation. *See* Tr. at 327 ("Don't know whether it was five years ago, twenty-five years ago."); Tr. at 336 ("[C]ould be ea[r] canal trauma, falling down in a playground."); Tr. at 348 (questioning Turk's diagnoses; speculating that Turk's records were shaped for insurance-billing purposes).

   d. Grynberg is entitled to damages for his broken nose.

7. With respect to lost wages: Grynberg was unemployed at the time of the accident. He has been employed for most of the time since the accident. He did not testify to any work missed on account of his nose or jaw injuries, or the adjustment reaction; he focused principally on his allegations that his brain injury and PTSD have caused him to accept employment paying "about $20,000 less" than jobs he held prior to the accident. Tr. at 45. Since those injuries are not causally related to the accident, the Court awards no damages for lost wages.

8. With respect to medical expenses:

   a. Grynberg presented no evidence of medical expenses for his broken nose.

   b. Grynberg has incurred approximately $25,000 in medical expenses for his jaw injury. Tr. at 208.

   c. Grynberg reached maximum medical improvement for his jaw injuries as of 2005 (when Klemons ceased treating Grynberg); as of that time, there was nothing "further that could be done to improve his conditio[n]." Tr. at 181.

   d. The Court does not credit Klemons's opinion—based upon his brief evaluation of Grynberg in the courthouse during trial—that a future surgery or surgeries will be necessary. See Tr. at 181-83.

   e. The Court awards $25,000 for medical expenses.

9. "The measure of damages for pain and suffering and emotional distress is fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case. Unlike pecuniary losses, these damages are, by their nature, not susceptible to mathematical computation." *Mathie v. Fries*, 935 F. Supp. 1284, 1304 (E.D.N.Y. 1996), *aff'd*, 121 F.3d 808 (2d Cir. 1997). Guidance may be found, however, in prior awards involving similar torts, similar injuries, or both. *See In re Air Crash Near Nantucket Island*, 307 F. Supp. 2d 465, 469 (E.D.N.Y. 2004) ("Damage awards in analogous cases provide an objective frame of reference, but they do not control [the Court's] assessment of individual circumstances." (quoting *Moore v. M/V Angela*, 353 F.3d 376, 384 (5th Cir. 2003))).

   a. With respect to Grynberg's adjustment reaction:

      i. The Court reviewed cases involving adjustment reactions, but these invariably involved much more serious psychological traumas. Grynberg sought no treatment for his adjustment reaction, which ultimately resolved and left no psychological damage caused by the accident. Nonetheless, the accident was a serious incident, and the

Court credits Grynberg's testimony and Fayer's opinion that Grynberg suffered some psychological injury.

ii. The Court believes that an award of $25,000 is sufficient to compensate Grynberg for past pain and suffering caused by his psychological reaction to the accident. No award for future suffering is necessary since his adjustment reaction has resolved.

b. With respect to Grynberg's nose:

i. The Court considered 27 verdicts since 2005 across the United States where a jury awarded damages to a plaintiff who suffered a broken nose (among other injuries). The verdicts involved a range of causes of injury, the most frequent of which were batteries and automobile accidents.

ii. Half of these awards were between $11,506 and $69,784. The Court relies upon these reported rewards merely to create some kind of scale against which Grynberg's injury can be measured. Grynberg's nose injury was relatively average compared to the verdicts reviewed. It did not require immediate medical attention, did not bleed, and did not cause permanent damage. Nonetheless, it did cause pain and did require a reconstructive procedure, which itself was painful.

iii. Although no case is identical to Grynberg's, the Court relied in particular upon the following jury or bench trial awards in guiding its selection of an appropriate damages award:

(1) *Ricco v. JP David, Inc.*, 2009 WL 603094 (N.J. Oct. 8, 2009): Plaintiff suffered broken nose when struck by falling chandelier; surgery did not completely restore nose to prior condition; jury awarded $108,642 for all damages.

(2) *Koerner v. AllState*, 2009 WL 1324891 (Texas Apr. 17, 2009): Plaintiff suffered broken nose and deviated septum (and other injuries) in automobile accident; jury awarded approximately $40,000 in general damages.

(3) *Chandler v. McGorty*, 2008 WL 5688332 (Conn. May 2, 2008): Plaintiff suffered broken nose and minor contusions when struck in face by mug thrown by defendant; verdict does not report whether nose was completely repaired; after bench

9

trial, judge awarded $75,000 in noneconomic damages.

(4) *Stanley v. Wooters*, 2007 WL 4246999 (Texas Nov. 5, 2007): Plaintiff suffered broken nose (and other injuries) in automobile accident; reconstructive surgery did not completely correct the injury; jury awarded $80,000 in pain and suffering damages.

(5) *Pollin v. Davis*, 2005 WL 1083417 (N.J. Mar. 30, 2005): Plaintiff suffered broken nose (and back injuries) in automobile accident; reconstructive surgery repaired nose injury; jury awarded $45,000 in damages.

iv. The Court awards $50,000 in past pain and suffering for Grynberg's nose injury. No award of future pain and suffering is necessary since Grynberg's nose has been repaired.

c. With respect to Grynberg's jaw injury:

i. The Court considered a number of recent verdicts rendered in the United States where a jury awarded damages to a plaintiff who suffered a TMJ injury (and, usually, other injuries). The awards ranged between a low of $1,500 and a high of $1,500,000, a range so wide it is of little utility. Among these awards, however, the Court observed that permanent TMJ injuries typically received far greater compensation than non-permanent TMJ injuries.

ii. Although no case was identical to Grynberg's, the Court relies in particular upon the following cases, each of which presented permanent TMJ injuries similar to Grynberg's:

(1) *Shankle v. All-Rite Hauling, Inc.*, 2010 WL 1747482 (Fla. Mar. 18, 2010): Plaintiff suffered permanent TMJ injury in head-on automobile accident; forced to switch to an all soft-food diet and avoid sneezing and yawning to lessen pain; jury awarded approximately $375,000 in damages in addition to award of medical expenses.

(2) *Kodryanu v. Grindler*, 22009 WL 5207275 (N.J. Oct. 20, 2009): Plaintiff suffered permanent TMJ injury in automobile accident that was exacerbated in second automobile accident (as well as other serious injuries); forced to wear a mouth guard; jury awarded total of $500,000 for both accidents,

10

inclusive of all damages.

(3) *Koscis v. McGee*, 2009 WL 380243 (Fla. July 9, 2009): Plaintiff suffered permanent TMJ injury in automobile accident requiring surgery; jury awarded approximately $415,000 in damages in addition to award of medical expenses.

(4) *Thomas-Vasciannie v. State*, 836 N.Y.S.2d 495 (Table), 2006 WL 4030732 (N.Y. Ct. Cl. Apr. 13, 2006): Plaintiff involved in head-on automobile accident, causing permanent TMJ injury (and two other serious injuries); court awarded a total of $695,000 in past and future pain and suffering to the plaintiff for all three injuries.

(5) *Braatz v. Damron*, 2000 WL 167544 (unpublished) (Minn. Feb. 15, 2000): Plaintiff suffered permanent back, neck, and TMJ injuries in automobile accident; Minnesota Court of Appeals affirmed jury award that included $307,500 in past and future pain and suffering.

iii. The Court takes judicial notice that the Social Security Administration estimates that Grynberg, a male born on September 26, 1969, can be expected to live for an additional 39.9 years. *See* Social Security Online, Life Expectancy Calculator.[1] He will therefore have to deal with the daily pain and discomfort caused by the TMJ injury, as well as the consequential changes it has had upon his diet and social life, for nearly 40 years.

iv. Based on these considerations, the Court awards $400,000 in past and future pain and suffering for Grynberg's TMJ injury.

---

[1] Available at: http://www.socialsecurity.gov/OACT/population/longevity.html (last accessed July 21, 2010).

## CONCLUSION

For the foregoing reasons, the Court awards Grynberg $25,000 in medical expenses and $475,000 in past and future pain and suffering, for a total award of $500,000.

**SO ORDERED.**

                                                    s/Frederic Block
                                                  FREDERIC BLOCK
                                                  Senior United States District Judge

Brooklyn, New York
July 22, 2010